### STERNBACH v. FRIEDMAN et al.

(Supreme Court, Appellate Division, First Department.    November 25, 1898.)

1. REFORMATION OF INSTRUMENT—EVIDENCE.
   Where the evidence is in irreconcilable conflict, the court will not reform an instrument for mistake or fraud.
2. PLEADING—SUBROGATION—ACCOUNTING.
   An answer in a suit on a bond to secure a retiring partner's capital and the firm's debts alleged that certain certificates were given the partner in payment of, or to secure, his capital, and prayed for an accounting as to the debts, so that any securities held by him might be delivered to defendant in subrogation, on payment by defendant of the amount found due.    Held, to sufficiently raise the question of subrogation.
3. PRINCIPAL AND SURETY—SUBROGATION.
   A surety paying a debt for his principal is entitled to be subrogated to the creditor's rights in other securities held by him for the same debt.
4. SAME—ACCOUNTING.
   Where a surety is sued on a bond to a retiring partner to secure his capital and the firm debts, the partner having other security for his capital, equity can compel an accounting to ascertain the debts, so that, on payment of the entire amount found due, the surety may be subrogated to the other security; and this though the suit be a foreclosure of a mortgage securing the bond.
5. NEGLIGENCE OF AGENT—LIABILITY OF PRINCIPAL.
   A creditor holding collateral and also the bond of a surety consented that his attorney should deliver the collateral to the surety, who, on payment of the bond, would be entitled to subrogation, but through the attorney's negligence and the fraud of his clerk they were misappropriated. The only requests from the latter for them came through one known to

the attorney to be interested in securing them himself. *Held*, in an action on the bond, that the surety should be credited with their value.

Appeal from special term, New York county.

Bill by Philip Sternbach against Yette Friedman and Marcus Rosenthal, impleaded with others. There was a judgment for plaintiff (50 N. Y. Supp. 1025), and defendant Friedman appeals. Modified.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

David Leventritt, for appellant.
Emanuel Myers, for respondent.

PATTERSON, J. This is an appeal from a judgment entered in favor of the plaintiff in an action for the foreclosure of a mortgage. The record is voluminous, and the evidence, as contained in it, is filled with such contradictions as show deliberate false swearing by witnesses on one side or the other. The appellant, Mrs. Friedman, made and executed the bond and mortgage mentioned in the complaint, and upon the trial it was conceded by her counsel at the outset that she is liable for something thereupon, dependent upon the result of an accounting; and he claimed, substantially, that it was for him to prove an affirmative defense set up in the answer, and allegations which, if established, would require a reformation of the instruments. That defense is that by mistake on the part of the defendant Yette Friedman, and fraud on the part of the plaintiff, or those acting for him, the bond and mortgage were so drawn as to secure other and greater obligations than those Mrs. Friedman had agreed to assume. Certain facts are conceded, namely, that the plaintiff and one Marcus Rosenthal were co-partners in business in January, 1896; that a dissolution of that firm was in that month agreed upon; that the plaintiff was to receive payment, or security for the payment, of $10,000, which he had put in as capital, and also indemnity against liability for debts of the co-partnership. It is also conceded that Mrs. Friedman was induced to make the mortgage sought to be foreclosed in this action, and to join in the bond to which it was collateral, as security; but her contention is that it was only for the indebtedness of the firm to its creditors, and that the plaintiff's contribution to capital was to be and was paid by the relinquishment to the plaintiff of certain warehouse certificates of the value of $10,000. She alleges in her answer that such was her understanding of the terms upon which she was to give the bond and mortgage, and she prayed for a reformation of the instruments so that her liability might be limited to one for the indebtedness of the firm to its creditors. The negotiations preceding and the circumstances attendant upon the execution of the mortgage were made the subjects of extended inquiry in the examination of witnesses on the trial. Mrs. Friedman, the defendant Rosenthal (her son-in-law), Mrs. Rosenthal (her daughter), Theodore Friedman (her son), and Jacob Baum (her brother) testified to a state of facts which, if true, proves that she was the victim of a gross fraud. She is an illiterate woman, totally unable to read or write. She testified that, being informed of the serious involve-

54 N.Y.S.—39

610    54 NEW YORK SUPPLEMENT    (Sup. Ct.

• and 88 New York State Reporter.

ment of her son-in-law in his co-partnership relations with the plaintiff, she was induced to attend twice at the office of the plaintiff's then attorneys, and that she agreed to give security for the debts of the co-partnership, and that it was distinctly stated and admitted that the plaintiff's contribution to capital was paid back to him by the warehouse, or, as they are called, whisky, certificates. Rosenthal, Jacob Baum, and Friedman testified to the same thing; and Rosenthal and others, who were present at the time the bond and mortgage were executed at Rosenthal's apartment, also testified that when the papers were presented for execution, and read by the attorney acting for the plaintiff, it appeared from such reading that the warehouse certificates were referred to as having been taken as security, and not as payment, and thereupon a protest was made, and the attorney promised that the error should be corrected before the papers were used. On the other hand, there is testimony given by the attorney referred to, and by the stenographer to whom the papers were dictated, that at the office of the attorneys acting for the plaintiff the drafts of such papers were read in the hearing of Mrs. Friedman; that they contained the same provision respecting the warehouse certificates as in the executed instrument; and the notary public who took the acknowledgment of Mrs. Friedman at the time the papers were signed and delivered contradicts everything testified to by the defendants' witnesses concerning the alleged protest against, or criticism of, the contents of the papers, when they were read by the attorney on the occasion last referred to. In that state of the evidence the justice at the special term held that the defendant Friedman had not made out by a preponderance of evidence a right to have the bond and mortgage reformed.

On a critical examination of all the record, we fail to see what other disposition could have been made of this branch of the case. Everything depended upon the credibility of witnesses. In the irreconcilable conflict between them, there are no circumstances to which we may give heed to turn the scale either way. We must assume, then, that the bond and mortgage were to stand as security according to their terms; and it is not disputed that Mrs. Friedman occupies, as to the plaintiff, the relation of surety for Rosenthal, his debtor. Just at this point of the case is introduced the subject of subrogation of Mrs. Friedman to the right of the plaintiff to the warehouse certificates. It is claimed by the plaintiff that the pleadings are not in condition to give rise to an inquiry on that subject. But we do not so regard them. The history of those certificates, and the relation of the parties to them, came directly into the case. They are referred to in the answer by an allegation which sets up that they, at the time of the dissolution of the firm of Rosenthal & Co., were given to the plaintiff, either in payment or as security for the $10,000 capital. The determination of the court below was that they were taken as security. The defendant Friedman prayed that the plaintiff and the defendant Rosenthal be ordered to account to her respecting all the debts, liabilities, and obligations of the firm, the amounts paid thereon, and the amounts still outstanding and payable, to the end that the amount due upon the said bond and mort-

gage might be ascertained and determined, and that any and all securities held by the plaintiff as security for the performance of the condition of the bond be delivered to the defendant Friedman, upon the payment by her of the amount found due upon the accounting, and that she be in all respects subrogated to the rights of the said plaintiff with reference to said security; and that, in the event that the plaintiff cannot or shall not deliver such securities, or any of them, to the defendant, the value of said security be deducted from the amount found due. Thus the whisky certificates were drawn into the case. It plainly appeared that for the $10,000 capital the plaintiff had two securities,—one the whisky certificates, and the other the mortgage. The plaintiff has chosen to resort to the latter, and to enforce it by foreclosure. It is necessary in the action to take an account to ascertain what, if anything, remained unpaid of the debts of Rosenthal & Co. If nothing so remained unpaid, and the mortgage is held by the plaintiff (as matter of fact) only as security for the $10,-000 capital, then it is not to be disputed that upon the payment of that amount of money the defendant Friedman would be entitled to be subrogated in equity to the rights of the plaintiff in and to the whisky certificates. If debts remain unpaid, the defendant Friedman would not be immediately entitled to the possession of the certificates, for, under ordinary circumstances, the creditor is entitled to hold his collateral until all that is due him is paid. It is undoubtedly the law that a surety, as a general rule, is only entitled to subrogation upon the payment of the indebtedness of his principal to the creditor; but where a creditor holds as collateral security two funds, viz. property of the debtor, and, in addition thereto, liability of a third party,—a guarantor,—and the creditor elects to look to the liability of the guarantor, and the amount of that liability cannot be ascertained until a judicial accounting, a court of equity has full power to define the rights of the parties as to both classes of security, and to control in the hands of the creditor that to which the guarantor may be entitled on a full judicial determination of the extent of his liability, and satisfaction of the amount found due. Railroad Co. v. Little, 41 N. J. Eq. 521, 7 Atl. 356. It needs no citation of authorities to show that a surety who pays a debt for his principal is entitled to be put in the place of the creditor, and is also entitled to all the means which the creditor possessed of enforcing payment against the principal debtor; nor that it is within the power of a court of equity, when the creditor applies for relief against the surety, to require the creditor to account for those things to which the surety may be entitled on payment, and to make a decree upon all the facts as they appear before it. That is simply the exercise of the ordinary power of a court of equity to determine all that is in contest between the parties to a suit before it, and to settle equities definitively. Circumstances may be disclosed showing that it is impossible for the surety to know how much he must pay until an accounting is had between the creditor and the debtor, and it is appropriate to the final disposition of such a case that a decree should provide for the substitution of the surety in the place of the creditor upon ascertainment and payment of the amount of the surety's liability. Thus the court

would have power to control all securities in the hands of the creditor. The power is not restricted because the rights of the parties are involved in an action to enforce payment by foreclosure of a lien given by the surety on his property. The proofs in this case showed that Mrs. Friedman, upon payment of such amount as might be found due on the mortgage, might be entitled to subrogation to the rights of the plaintiff to the whole or some part of the whisky certificates. That depends on the result of the accounting. But the plaintiff has sought to discharge himself from any responsibility for those certificates, and in doing so has shown that Mrs. Friedman cannot have the actual benefit of them in this action. He contends, and has endeavored to show, that in recognition of Mrs. Friedman's claims to those certificates and her right to control or have them applied, they were delivered into her possession, and that thus he is freed from all accountability concerning them. It appears from the record that these certificates were taken by the plaintiff from the safe of Rosenthal & Co. a day or two before the dissolution of that firm, and thenceforth, and until the 27th day of May, 1896, were always in the possession of one of the attorneys at law of the plaintiff. At some time shortly before the last-mentioned date, Rosenthal made application to that attorney for the certificates, desiring to use them in his own business, and for his own purposes. The attorney was willing to aid Rosenthal in obtaining the certificates, but, as he states himself, he knew they could not be restored to Rosenthal without the consent of Mrs. Friedman, and therefore, he declares, he sent them by a messenger to Mrs. Friedman, inclosed with a letter as follows: "Agreeably to your request, we herewith deliver to you the whisky certificates held by us, and which we surrender to you upon the distinct understanding that you accept the same without in any way or manner affecting or impairing the bond and mortgage given by you to Mr. Philip Sternbach." Reilly, the messenger, swore that he delivered the certificates and the letter, in the form of a package, to Mrs. Friedman. His testimony was contradicted by four witnesses. The trial judge did not believe him, but, on the contrary, held that "by blandishments and a bribe" Rosenthal induced Reilly to hand the package to Rosenthal's wife, who subsequently gave it to her husband, and not to Mrs. Friedman. The trial judge found that the debtor got possession of the securities without the knowledge or procurement of the defendant Freidman, but held that it was against the will, and without the fault, of the plaintiff; that the proof was clear that neither the plaintiff nor those who were acting for him intended that the debtor should have the securities, except with the consent of Mrs. Friedman; and the plaintiff was exonerated from all responsibility respecting those certificates.

The evidence is convincing that a flagrant fraud was perpetrated on Mrs. Friedman in dealing with these certificates. We are not disposed to hold, upon this record, that the attorney concocted that fraud in collusion with the defendant Rosenthal, for we would not be justified in acting upon mere suspicion. But the question here is, not as to responsibility for the fraud of Rosenthal and Reilly, but responsibility of the plaintiff for the loss or destruction, so far as Mrs. Fried-

man is concerned, of those certificates, to which, by the admission of the attorney, she was entitled, either absolutely or contingently, and which it was his purpose to give into her possession. Where the creditor so deals with a security to which a surety may be entitled by way of subrogation as to lose it or destroy it, he is accountable for the value of that security to the surety paying the debt, or, as in this case, whose property is resorted to to pay the debt. As the learned justice at special term said, the rule is elementary that if the creditor loses, or without the consent of the surety parts with, security, the surety is discharged to the extent of the security. Pol. Cont. p. 251; Griswold v. Jackson, 2 Edw. Ch. 461; Sailly v. Elmore, 2 Paige, 497; Hayes v. Ward, 4 Johns. Ch. 123. It is true that the degree of care required by the creditor is sometimes an important element in an inquiry of this character, but no such question arises here. The plaintiff's attorney assumed the performance of an act which he regarded as a duty respecting those certificates,—he undertook to put them in the hands of Mrs. Friedman. Neither he nor the plaintiff may be responsible for the fraud by which they were intercepted so that they never reached her; but the question lies back of that, and is whether the loss to Mrs. Friedman is the result of negligence of the attorney, and whether the plaintiff is responsible for that negligence. It is not the infidelity of Reilly, nor the abstraction of the securities by Rosenthal, that would discharge the surety, but the conduct of creditor or his agent in so dealing with that security as to create the opportunity for Rosenthal to abstract it. The facts connected with the attempt to deliver the warehouse certificates to Mrs. Friedman plainly appear. She never got them, and never consented to their delivery to Rosenthal. He wanted them for himself, and overtures looking to that end were made by him to the attorney in whose custody they were. The plaintiff knew it. His testimony is: "I knew about the intention to deliver them. My brother told me." The plaintiff says they were in the attorney's possession, and he did not personally give the attorney any instructions about the delivery at all. "I did not see Mrs. Friedman about the delivery. I did not take the trouble to go and ask her whether she wanted them or not." The brother referred to is Morris Sternbach, who represented the plaintiff in matters connected with these whisky certificates, and whose authority to bind the plaintiff is in no way questioned or repudiated. Morris Sternbach says the conversations respecting the surrender of the certificates were had principally between Rosenthal and himself. Rosenthal told him that if he could get the whisky certificates, and convert them into money, he could see a way of liquidating the debts of the firm, as well as indebtedness due the plaintiff and Morris. Morris Sternbach told Rosenthal that the whisky certificates were collateral, and that he would not give them up except with the advice of his lawyer; and thereupon he (Morris Sternbach) told the attorney that he had no objection to give up possession of the whisky certificates. To quote from his testimony: "I wanted Mrs. Friedman to have those certificates, and a letter was discussed between us [himself and the lawyer], which, however, I did not wait long enough to see. The letter I did not see. I simply

discussed the tenor of the letter to Mrs. Friedman, and the certificates to be addressed and delivered to Mrs. Friedman, as far as I know." He also says: "I was perfectly willing to let Rosenthal have the certificates, and I wanted Mrs. Friedman to know they were given up. Perfectly willing to let him have them. I had no objection to that." "I understood that, if those certificates were delivered to anybody, they were to be for Rosenthal's benefit directly, and for the payment of the bond indirectly for the idea of extricating himself, and for the payment of his debts, and to free Mrs. Friedman." "I understood that Rosenthal wanted those whisky certificates in order to convert them into money for the purpose of extricating himself, and to liquidate his debts to us, to my brother, and thus free Mrs. Friedman from her bond. I did not know that Mrs. Friedman must consent to that under the circumstances." The attorney, in his testimony, states that in a conversation between himself, Rosenthal, and a Mr. Todd (Rosenthal's lawyer) it was determined that the whisky certificates should be sent direct to Mrs. Friedman; that he had frequent conversations with Rosenthal upon the subject; that he never saw Mrs. Friedman concerning it, nor had any conversation with or communication from her upon the subject. All that he knew of any alleged wish or desire on the part of Mrs. Friedman to have these certificates emanated from Rosenthal or Mrs. Rosenthal, and he swears that the letter he wrote to Mrs. Friedman was based altogether upon what he heard from Rosenthal and his wife; and that the words "agreeably to your request," contained in that letter, refer to a request believed to have been communicated through Rosenthal. Here, then, is the simple case of an agent charged with an active duty as to negotiable securities, namely, to deliver them into the hands of a particular person, conceded to be entitled to them, who gets all his information as to the wishes of that person from an individual interested in abstracting them; an agent who never takes the trouble to verify the representations that an interested person has made to him, except by inquiring of those who, from their situation, would aid in his purpose; an agent who totally ignores the person entitled to the securities, and then, in reliance upon the statements of a party whom he must have known was unworthy of belief, parts with them in such a way that they never reach the one entitled to them. The plain and obvious course dictated by ordinary prudence would have been for the attorney to inquire of Mrs. Friedman formally if she wanted the certificates, informing her that Rosenthal was applying for them upon the representation that she was willing he should have them. The attorney endeavors to excuse himself by alleging that Mrs. Friedman was unable to read or write, and that, therefore, communicating with her would have been an idle ceremony. But it would appear to even the most unsophisticated person that that was the very reason he should have been zealous to see her personally, and ascertain her wishes, or send some reliable person to her to inquire if she wanted the certificates, and in what way they should be delivered to her. These certificates are lost to Mrs. Friedman through the negligence of the attorney, and the question remains as to the responsibility of the plaintiff for that negligence. He knew of the intention to de-

liver them, and made no objection. He did not take the trouble, as he himself swears, to do anything in the matter of their delivery. He left it altogether to his brother and the attorney. The attorney was acting within the scope of his authority. He had the right to believe that the delivery of the certificates was authorized by the plaintiff; that the duty to deliver them was imposed upon him by the plaintiff; and for his methods of dealing with those securities the plaintiff is as much responsible as if he had dealt with them himself. It is not the case of the fraud of an agent. We will take the attorney's own statement respecting his good faith, and then the fact remains that, for the want of proper inquiry or due notification to Mrs. Friedman of what was to be done with those securities, the opportunity was created for Rosenthal to cheat Mrs. Friedman out of them. If the plaintiff had personally acted with these certificates in the way his attorney did, there could be no doubt of the exoneration of the surety. Under the circumstances of this case, the attorney's acts and omissions were those of the plaintiff, and we think Mrs. Friedman is exonerated from so much of the obligation upon the bond for the plaintiff's capital as is equal to the value of the whisky certificates on May 27, 1896, and that the lien of the mortgage as applicable to capital is released pro tanto.

These views require that the judgment be modified so that it shall be adjudged that the mortgage sought to be foreclosed in this action is a security to the plaintiff for unpaid indebtedness of the firm of Rosenthal & Co. and for the capital contributed by the plaintiff to that firm, but that Mrs. Friedman is entitled to be credited with the value of the whisky certificates on the 27th of May, 1896. The judgment should also be an interlocutory, and not a final, one. King v. Barnes, 107 N. Y. 645, 13 N. E. 799. It should provide for an accounting, and final judgment of sale and distribution should not be made until after confirmation of a referee's report upon such accounting; costs of appeal to appellant to abide event, and costs of action to be determined upon the application for final judgment. All concur.